[No. 1821.]

### John Ninnon *v.* The State.

1. CONTINUANCE — DILIGENCE.— See the statement of the case for a showing sufficient to authorize the award of a continuance, the diligence being ample and the absent testimony, although cumulative, of a material character.
2. CHARGE OF THE COURT — CIRCUMSTANTIAL EVIDENCE — ALIBI.— See the statement of the case for a charge upon circumstantial evidence which, had it been excepted to, would have been held insufficient. Note also a state of proof that demanded of the court a charge upon the question of *alibi.*

3. EVIDENCE — RECORD EVIDENCE.— Records of marks and brands are not such
   instruments of writing as are contemplated by article 2257 of the Revised
   Statutes, and it was not error, in a prosecution for cattle theft, to admit
   proof of the recorded marks and brands of the alleged owners of the al-
   leged stolen cattle.

APPEAL from the Criminal District Court of Harris. Tried below
before the Hon. Gustave Cook.

The indictment, alleging the offense to have been committed on
the 15th day of October, 1883, in Harris county, Texas, charged
the appellant with the theft of ten head of cattle, the property of
J. F. Muskee, one head of cattle, the property of George Patterson,
one head of cattle, the property of Will Brookshire, and one head
of cattle, the property of George Roberts. The trial of the appel-
lant resulted in his conviction, and his punishment was assessed at a
term of two years in the penitentiary.

J. F. Muskee was the first witness for the State. He testified
that he resided in Waller county, Texas, and was acquainted with
the defendant John Ninnon, who lived in the same neighborhood.
The witness had cattle stolen from him in October, 1883. His stock
ranged in Harris and Waller counties. Witness missed his cattle
from the range in Waller county in large numbers, and made dili-
gent search and inquiry for them, but failed to find any of them.
Finally witness went to Houston, in Harris county, and examined
the books of the inspector of hides and animals. He found ten head
of cattle in his mark and brand entered on those books as inspected
on the 17th day of October, 1883. Witness did not of his own
knowledge know that the defendant took these cattle, but, if
he did take them, he did so without the knowledge, authority or
consent of the witness. These animals were sold by the witness,
but they were stolen from him. Witness's brand was OSO on the
left side, and his mark an underslope in the left and an overbit in
the right ear, which said mark and brand is of record in both Harris
and Waller counties. Here the State put in evidence a certified
copy from the record of marks and brands of Waller county, show-
ing that the witness had recorded his said mark and brand. Wit-
ness did not see the cattle in Harris county, and only knew them to
be his by the mark and brand as recorded in the inspector's office.
Witness knew of no other mark and brand like his.

George Patterson was next sworn as a witness for the State.
He testified that his cattle ranged in Waller county, Texas.
He lost a number of head in October, 1883, and among them a cow
which he knew by the flesh marks. Witness made diligent but un-

successful search for the missing cattle, and finally went to Houston and examined the books in the inspector's office. He found a cow recorded in that book in his mark and brand, as inspected on the 17th day of October, 1883. Witness's brand was GVP, the VP being connected on the right hip. His mark was an underslope and underbit in each ear. This mark and brand was recorded in Waller county, Texas, in the witness's name, as evidenced by the certified copy from the records of marks and brands of Waller county, introduced by the State. The witness did not see this cow or any other animal of his in the possession of the defendant, and did not know that the defendant took this or any other of his animals. This cow, by whomsoever it was taken, was so taken without the witness's knowledge or consent.

Will Brookshire was the next witness for the State. He testified that he knew the defendant. The witness lost a number of head of cattle, missing them from their range in Waller county, Texas. He made diligent but unsuccessful search for them, and finally went to Houston and examined the books in the office of the inspector of hides and cattle. On those books he found registered a cow in his mark and brand. Witness had previously lost a cow answering to the description recorded in the inspector's books. Witness's brand was } B on the left hip; his mark a swallow-fork and undersplit in the right, and a crop and a half crop in the left ear, which mark and brand were recorded in Waller county, Texas, as evidenced by the certified copy from the Waller county records, produced by the State.

A. M. Glass was the next witness for the State. He testified that he was the deputy inspector of hides and cattle for Harris county, and held that office in October, 1883. He knew the defendant John Ninnon by sight. He saw the defendant in Harris county on the 17th day of October, 1883, having once seen him before. On the 17th day of October, 1883, the defendant applied to witness to inspect a car-load of cattle he had in Houston for the purpose of shipping them to New Orleans. In the bunch of cattle which witness so inspected for him were ten head of steers branded OSO on the left side, and marked with an underslope in the left and an overbit in the right ear; one cow branded GVP, the VP connected, on the right hip, and marked with an underslope and underbit in each ear, and another cow branded } B, and marked with a swallow-fork and undersplit in the right ear and a crop and half crop in the left ear. The defendant claimed these cattle as his, and placed them in a car with other cattle bound for New Orleans, and the

witness procured a pass for defendant to go with them. Witness did not know whether or not the defendant went. When defendant applied to witness to inspect the cattle, he told witness that his name was Rufe Muskee, and he signed the name of Rufe Muskee to the contract of shipment. Witness had no doubt of the identity of the defendant. When the owners asked witness about the cattle and the shipper, witness told them he would know the man at sight.

Cross-examined, the witness stated that he went to the town of Pattison for the purpose of identifying the defendant, and identified him under the following circumstances: Witness was blindfolded, and a large number of men were placed in a row. Among them was a man who had on a hat like that of the defendant. When the blind was taken from the witness, he walked up to this man and placed his hands on his shoulders, and when he turned around witness remarked: "This is not the man." He then caught sight of the defendant, recognized him instantly, and pointed him out as the defendant. Witness did not go to Pattison with Muskee, Patterson or Campbell.

Rufe Muskee, sworn for the State, testified that he knew the defendant John Ninnon. Witness was not in Houston on the 17th day of October, 1883, and has never shipped cattle to New Orleans. The defendant had no authority to use witness's name in that or any other character of transaction. Witness did not know of his own knowledge that defendant had ever done so. At this point the State rested.

Carl Ninnon was the first witness for the defendant. He testified that the defendant was his son. On the 17th day of October, 1883, the defendant was at his home in Waller county. Witness saw him at his home on that day, and had seen him at his home every day for a week prior to October 17, 1883.

Cross-examined, the witness stated that he was enabled to remember the date on which he saw his son at his home by a book in which he kept the time of all the men in his employ. Witness went over to his son's house on that day to get him and his sister to aid him in picking cotton. Defendant said that he was too busy picking his own cotton to go.

At this point the State's counsel remarked: "Then you did not get the information from your book, if you did not hire him." To this the witness answered: "No, I did not get it from my book, but I know it was the 17th of October, 1883. I know the days in the month and know it was the 17th of October, 1883. I know it because he was arrested, and that fixed my mind on it."

To the question: "When was he arrested?" the witness answered: "I do not remember when he was arrested. When he was arrested I was informed of the day he was said to be in Houston with the cattle, and it occurred to my mind then that I had seen him at home on that day. His home, in Waller county, is forty miles from Houston."

Ottillie Ninnon testified, for the defense, that she was a sister of the defendant. She knew that the defendant, John Ninnon, was at home in Waller county, all day on October 17, 1883. Witness was certain of this fact. She lived with the defendant and picked cotton with him all day on that day.

On cross-examination, the witness testified that she did not hear that he was charged with stealing cattle on that day. In December, 1883, she heard that he was under charge of having stolen cattle on October 17, 1883. Defendant was arrested in December, and it occurred to witness's mind at that time that she knew he was at home on October 17, because he had not been absent a single day during that month.

Franz Roessler testified, for the defense, that, on October 17, 1883, he saw the defendant at his home in Waller county. He was certain of this fact, because he saw the defendant nearly every day.

Cross-examined, the witness said that he was able to locate the day he saw the defendant as the 17th by the fact that the 16th day of October, 1883, was his, witness's, birthday, and he went the next day to hunt oxen and saw the defendant at his home. A. Hencke was with witness at the time, and he also saw the defendant and his sister in their field. Witness could well recollect what he was doing on the 17th day of October, 1883. He was picking cotton for Mrs. Beman.

Frank Sturm was the next witness for the defendant. Witness was at Pattison the day that Glass went there to identify the man who shipped the cattle. Glass was met at the depot by the owners of the cattle, and circulated with them and their crowd for about an hour before the identification took place. Glass came up to witness. Defendant was standing next to witness, facing Glass. Glass turned witness partly around and said: "This is not the man." He then placed his hands on the defendant and said: "This is the man." In the manner in which this identification took place, it would have been easy for a man to have been directed how to single out the defendant, even though he had never seen him before.

James Rogers testified, for the State in rebuttal, that he was in the line at Pattison on the day of the identification. Defendant

stood next to the witness. Sturm stood with his back to Glass. Glass turned Sturm around and said "This is not the man." He then passed to defendant and said: "This is the man."

The defendant's application for a continuance, which is the subject-matter of the first head-note of this report, is as follows:

"Now comes the defendant and moves the court to grant him a continuance of this cause until the next term of this court, on account of the absence of the witness Albert Hencke, who resides in Waller county, Texas, and whose testimony is most material to this defendant upon a trial, and which said witness has been in attendance at this court in this cause, at each term of the same, except at the last term hereof.

"That this defendant has used due diligence to procure the attendance of said witness upon the trial hereof, in this: On the 4th day of December, 1884, which was the first day of this term that said cause was called, defendant caused an attachment to issue out of this court directed to the sheriff of Waller county, Texas, for the said absent witness, and on same day had same to be inclosed in an envelope and sent in the usual course of mail to the said sheriff of Waller county, Texas, and which said attachment has been by the said sheriff returned into this court to-day 'not executed as to said witness, said witness Albert Hencke not to be found in the county,' and which said writ of attachment is hereto attached and made a part of this application.

"That he expects to prove by the said absent witness that he, the defendant, was not absent from his home in Waller county, Texas, on the 15th day of October, 1883, the day charged in the indictment, nor at any time near or about that time; that said witness will swear that the defendant was at his own house and home at the time he is charged in the indictment, and the time which the State's witness Glass will testify and maintain, the theft and possession of the cattle in the defendant; and also that said prosecuting witness William Muskee has threatened serious injury to said witness and other witnesses of defendant if they should come to Houston and testify herein, showing his *animus* to defendant and his cause; all of which is material for the jurors trying the cause to know and be informed of; that he has cause to believe and verily does believe that said Albert Hencke has been intimidated by the prosecuting witness William Muskee, from attending the court on this trial, for the reason that heretofore, to wit, in the month of September, 1884, in Waller county, Texas, said prosecuting witness made an assault upon said Hencke, because said Hencke was a wit-

ness for defendant, and it was known to said prosecuting witness that said Hencke would, and intended to, swear that he knew of the defendant's whereabouts at the time he, defendant, is charged with having committed this crime, and that it was impossible for defendant to have committed same; and that said prosecuting witness did then and there notify defendant's witness if he dared come to Houston to testify in behalf of defendant, that he would give him a sound beating; that this defendant verily believes, and therefore charges, that said Hencke is absent from the court now because of his fear and terror that said Muskee will execute his said threat.

"In support hereof defendant attaches the affidavit of Franz Jamrosch to the above facts, a witness who was present at the time of said intimidation, and who, defendant says, has also been intimidated by said prosecuting witness and assaulted.

"That said witness is not absent by the procurement or consent of defendant; that this application is not made for delay, but that justice may be done.

"That there is no reasonable expectation that the attendance of said witness can be procured or secured during the present term of the court by a postponement of said trial to a future day of this term.

"That the said testimony cannot be procured from any other source known to defendant; that the defendant has reasonable expectation of procuring the same at the next term of this court."

This application, being subscribed and sworn to by the defendant, was supported by the affidavit of Franz Jamrosch, setting forth the facts of intimidation detailed in the said application.

The charge of the court upon the subject of circumstantial evidence, which is the subject-matter of the second head-note of this report, reads as follows:

"The defendant is presumed to be innocent until the evidence satisfies you beyond reasonable doubt that he is guilty as charged, and excludes every and any reasonable hypothesis other than defendant's guilt."

The motion for new trial raised the questions discussed in the opinion.

*Fisher & Kirlicks*, for the appellant. Counsel for appellant respectfully contend that the court erred in allowing the certified copies of the record of brands of Waller county to be admitted in evidence above his objection.

The State failed to file them with papers of the cause, failed to

give any notice of the intended introduction of same, and made no
effort in any manner to show the genuineness of same, or prove up
their validity. This honorable court has held in similar cases that
the civil rules of practice should pertain. The very object of the
statute manifestly is to give the defendant or opposite party an op-
portunity to inquire into the genuineness of such copy of the record,
and to assail the same if fraudulent or not genuine, by affidavit.
This right the defendant was deprived of, and he promptly excepted
to the ruling of the court. We refer the court, in connection here-
with, to article 4561, Revised Civil Statutes.

Again: Defendant, through his counsel, contends that the court
cannot assume that the explanation made by defendant, at the time
of the alleged possession of the cattle, by him at Houston, to wit-
ness Glass, is unreasonable or untrue, for this is a question of fact
exclusively within the province of the jury to determine, and the
court should not (as in this case) have withdrawn the right of the
jury to pass upon that issue, by virtually himself deciding the issue,
by failing to charge the law governing explanations made by per-
sons in possession of recently stolen property. This, we respectfully
insist, is a part of the law of the case, arising under the facts, and
that therefore the court did not charge all the law on the case.

On the same subject, we respectfully submit, as it is the duty of
the court to charge all the law governing the facts of a case, and in
view of the fact that the inculpatory evidence is wholly circum-
stantial, it was the duty of the court to expound to the jury the
nature and conclusiveness of that character of evidence to warrant
a conviction upon it.

To incidentally touch upon the law of circumstantial evidence in
a feeble way does not meet the just and humane requirements of the
law, for that branch of the charge should stand in as conspicuous
prominence as any other part of the general charge.

We pass from this branch of the cause to the question:

Should the court have granted a new trial?

The defendant confronted the State and his prosecutors, in his
application for a continuance, backed up by the affidavit of a disin-
terested person (Jamrosch), with the damning accusation that they,
his prosecutors, had, through the medium of Wm. Muskee, by force,
personal violence and intimidation, prevented defendant's most ma-
terial witness — A. Hencke — from attending the trial; and we
blush to say that they yet stand before this honorable court, as they
did in the court below, in shameful defiant silence, without refuting
or denying the disgraceful imputation, which circumstance itself

stands a monument of rebuke to the trial court, and an indisputable evidence to this honorable court of the truth of the matters alleged.

We pause here to ask: Is this according a citizen the "fair trial" that the law, in all its majesty, has guarantied to give?

Do the prosecutors seek to refute this "arraignment foul?" No; but they ingeniously seek to avoid the issue by saying that the witness is a fugitive from justice. God save the mark! On the motion for a new trial the same point was urged, and yet "the silence was unbroken, and the stillness gave no token."

Would they not, we ask in the name of justice, have denied by affidavit, or on the stand, or otherwise, the guilty complicity brought directly home to their doors, on two occasions, if it were untrue? Can it be argued that the evidence of the witness was immaterial, or merely cumulative?

. The defense was an *alibi*, proven by defendant's father and sister and a boy, Franz Roessler. Did the jury attach near as much weight to the evidence of these witnesses, to wit, the father and sister and a boy, as they would have to the absent man, A. Hencke? His corroboration of the testimony of the relatives of the defendant and the boy would most probably have overcome Glass's testimony. Yet we take it as immaterial to the consideration of the question, "did defendant have a fair trial?" whether his testimony would have been only corroborative or not; although we contend that the circumstances of the case show him to be the most material. Was the appeal to the jury by associate counsel for the State in the "name of the members of the Live Stock Association" to find defendant guilty, consistent with fairness and justice?

Is the evidence sufficient to support the verdict? We think decidedly not. The State's witness, Glass, who had never seen the defendant but once before in his life, goes to Pattison some six weeks after to identify the man. He is met fondly and caressed by the prosecutors in this cause until the time allotted for the identification (?) has arrived, when he blindfolds himself, and the curtain is "rung up" for the "first act" in the farce. Glass then, as a feint to make believe he is acting fair, and without assistance, *aliunde*, partly turns the witness Sturm around, the defendant next to Sturm and facing Glass, then suddenly releases Sturm and selects defendant. What a mockery!

Why need an honest man go through the manœuvre of blindfolding himself — why use all this careful prelude? He knew who it was intended he should select. The defendant had been singled .

out before Glass arrived at Pattison as the victim of the inquisition.

We refer to Sturm's testimony, who says "that it was an easy thing for Glass to have singled out any given person, although he might have never seen him before — the way the thing was carried out."

We contend in conclusion that the evidence of defendant's witnesses, whose integrity is unimpeached, was sufficient to raise a reasonable doubt, and would have had such result with the jury but for the unfair argument used.

Is it not strange that the defendant could drive so large a bunch of cattle a distance of forty miles through a thickly settled country, into the densely populated city of Houston, and not an eye has seen him or the cattle but those of Glass? Is it not strange that no one of the twenty thousand inhabitants of Houston, including the shipping clerk and employés of the railroad company, ever saw or heard of such cattle being shipped or seen in defendant's possession, except Glass? For if such there were or had been, the prosecution in this cause, who have not spared time, means, money or energy to convict, would certainly have had such witness or witnesses fettered by attachment in court and such testimony in evidence.

The trial defendant has had was not a fair one; to let the verdict stand would be a dangerous sanction of very questionable practices.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. We are of the opinion that the court erred in refusing the defendant's application for a continuance. Sufficient diligence to obtain the attendance of the absent witness was shown. That the facts expected to be proved by this absent witness are material cannot be questioned. True, this testimony would have been only cumulative of other evidence adduced on the trial, but still it was material and the defendant was entitled to have it, and we cannot say, in view of the other evidence in the case, that the facts expected to be proved by this witness were not probably true. (*Miles* v. *The State*, 14 Texas Ct. App., 436; *Tyler* v. *The State*, 13 Texas Ct. App., 205; *Lawson* v. *The State*, Id., 264.)

No exceptions were taken to the charge of the court, and there are no such errors apparent in the charge as would cause the conviction to be set aside in the absence of such exception. We think, however, the charge upon circumstantial evidence would be insuffi-

cient had it been excepted to; and the facts of the case also demanded a charge upon the law of *alibi*.

There was no error, we think, in admitting proof of the recorded marks and brands of the alleged owners of the alleged stolen cattle. Records of marks and brands are not instruments of writing such as are contemplated by article 2257 of the Revised Statutes.

Because the court erred in refusing defendant's application for continuance and motion for new trial, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered March 20, 1885.]